**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ERIN PYDLEK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 24 C 4357 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| MARK ANTHONY BREWING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Erin Pydlek worked as the director of procurement at Mark Anthony Brewing,

Inc. ("MAB") from September 17, 2018 through March 14, 2023.  After MAB terminated her

position, she brought this lawsuit alleging equal pay violations of the Equal Pay Act ("EPA"), 29

U.S.C. § 206(d) *et seq.*, and the Illinois Equal Pay Act ("IEPA"), 820 Ill. Comp. Stat. 112/1 *et

seq.*; gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),

42 U.S.C. § 2000e *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/1

*et seq.*; and retaliation in violation of the IHRA, Title VII, IEPA, and the Fair Labor Standards

Act ("FLSA"), 29 U.S.C. § 201 *et seq.*  MAB has now moved for summary judgment.  Because

Pydlek has sufficiently established triable issues of material fact as to all her claims, the Court

denies MAB's motion [28].

**BACKGROUND**

**I.      Compliance with the Court's Summary Judgment Procedures**

As an initial matter, MAB raises various preliminary issues regarding Pydlek's

compliance with the Court's summary judgment procedures.  Specifically, MAB argues that

Pydlek's response improperly includes (1) additional undisputed facts not contained in the Joint

Statement of Undisputed Material Facts ("SUF") and (2) facts contradicted by the SUF. While the Court agrees that this is improper, MAB does not identify with specificity the facts to which it objects. Instead, MAB identifies three illustrative examples and leaves the remaining analysis to the Court. While the Court will disregard the specific examples identified, to the extent that they are truly new undisputed facts or facts contradicted by the record, it is not the Court's responsibility to individually parse every fact in Pydlek's response to speculate as to which facts MAB objects. *See Levin v. Altisource Sols., Inc.*, 755 F. Supp. 3d 1021, 1032 n.3 (N.D. Ill. 2024) (holding that defendant waived objections to facts asserted in summary judgment briefings because defendant "d[id] not specify which part of the fact statement they challenge" (citations omitted)). That said, the Court does not credit unsupported factual assertions as a matter of course.

## II.     Factual Background[1]

### A.     The Parties

MAB is a producer and distributor of alcoholic beverages, including fine wine, premium beer, and specialty beverages. In 2020, MAB began experiencing significant growth in volume, exposure, and sales, with a corresponding increase in the total number of MAB employees. Whereas MAB had approximately twenty-five employees in September 2018, this number grew to 612 employees by September 2022.

Pydlek began working as MAB's director of procurement on September 17, 2018, with a starting salary of $138,000 and the potential for a 30% bonus. Pydlek's position was a "leadership role requiring a high level of performance, competency, leadership skills, and strategic thinking," and executives at MAB expected Pydlek "to act and think like a company

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts, viewing them in the light most favorable to Pydlek, the non-movant.

2

leader." Doc. 30 ¶ 7. In this role, Pydlek led the procurement department, which included managing all direct material categories and some plant services, determining co-manufacturing process requirements, overseeing strategy development and sourcing execution, identifying alternative sources of supply, leading contract negotiations, and evaluating risks and opportunities for direct categories. She also worked to identify and implement continuous improvement initiatives to enhance procurement capabilities. Pydlek reported directly to John Sacksteder, who was then the senior vice president ("VP") of supply chain.

### B. Pydlek's Performance as Director of Procurement

From 2018 through 2021, Pydlek received on target reviews, salary increases, and over-target bonuses. In 2021 or 2022, however, MAB executives began raising concerns about Pydlek's performance and leadership style. Initially, Sacksteder and/or Colin Nolan, MAB's executive VP, discussed these concerns during one-on-one meetings with Pydlek. On November 30, 2022, Sacksteder met with Pydlek to provide her with performance feedback, including feedback about her lack of "executive presence" and her communication style and tone. Pydlek cried in his office. That same day, Pydlek reached out to Nolan to notify him of the interaction. She later sent an email to Nolan sharing her "findings" as to "why confident, professional women can sometimes be negatively perceived as abrasive when being assertive at work." *Id.* ¶ 34. She bolded the information that she found most enlightening, stating that she was "exploring some of [her] personal issues." *Id.* Although Pydlek considered the email to be a complaint of discrimination, MAB did not investigate whether unconscious bias played a role in any of her feedback.

On December 2, 2022, Sacksteder sent Pydlek an email reiterating some of his concerns with her leadership and competency issues. In this email, he criticized Pydlek for her "complete

3

lack of executive presence," off-putting "tone," and lack of office "etiquette." Doc. 31-7 at 29–30. As examples, he noted that Pydlek made "ill-timed interjections" during meetings and "immature" requests for salary increases and/or additional bonuses. *Id.* Nolan also sent Pydlek an email on December 2, 2022, stating that she did not appear to be taking the feedback she received into account. For example, he noted that she had continued using his office after he asked her to stop and that she again used "self-serving" language when asking for a bonus. He asked her to "course correct" her behavior and told her she needed to convince Sacksteder that she could align with MAB's core values as an organization.

Sacksteder sent Pydlek another email on February 14, 2023 to summarize continued performance issues. Specifically, he criticized Pydlek for being late to a client happy hour, working remotely without permission, and asking if he could reschedule a supplier dinner to accommodate her commitments. During a meeting the following day, Sacksteder discussed various action items for Pydlek to complete and acknowledged that she was beginning to understand the feedback she was receiving.

### C.     A.T. Kearney's Report

In June 2022, MAB hired a highly respected consulting firm, A.T. Kearney, to "provide advisory support and analyze potential improvements to MAB's supply chain organization design." Doc. 30 ¶ 50. A.T. Kearney produced a report with its recommendations, which included replacing or eliminating multiple director positions. Among these were Pydlek's position, which A.T. Kearney suggested replacing with a new VP of procurement position. MAB agreed with this recommendation but declined to consider Pydlek for the new role due to her purported leadership and performance issues. As a result, MAB terminated Pydlek's

employment on March 14, 2023.  Although A.T. Kearney recommended replacing or eliminating multiple director positions, Pydlek was the only employee terminated.

### D.    MAB's Subsequent Hiring Decisions

MAB replaced Pydlek's position with a VP of procurement, initially considering forty-six candidates for this role.  Interviews began in January 2023, but none of the candidates interviewed were women.  One candidate, Ryan Nied, had an MBA and had previously worked in procurement at multiple large companies.  An assessment administered during his screening indicated that he "show[ed] good potential . . . but could experience some challenges to successful performance," particularly related to talent management, because he reacted to stress by "becoming argumentative and controlling" and "had a relatively low score in empathy."  *Id.* ¶ 68.  Nonetheless, MAB offered Nied the position and negotiated with him a starting salary of $270,000.  He started with MAB on March 15, 2023, receiving two sign-on bonuses totaling $290,000.  After about a year, he received another $108,000 bonus and a 2.9% salary increase to $278,000.

In July 2024, MAB also hired Andrew Crafton as a new director of procurement with a salary of $196,000.  In comparison, Pydlek's salary as of her termination was $168,000.  Nolan testified that he believed Crafton was "at a different level" than Pydlek, given his "experience across large blue chip organizations and the value that he created in the risk management approach."  *Id.* ¶ 82.

After Pydlek's termination, MAB determined that she was not eligible for rehire.  This was not a standard decision, and it was "abnormal" for an employee whose position was eliminated to be deemed ineligible for rehire unless they exhibited "red flags" as determined by

leadership.  Pydlek applied for positions as the director of demand and the director of supply and materials planning, but she did not receive an interview for either position.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record.  Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).  The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018).  In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014).  The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013).  However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I. Unequal Pay Claims (Counts V, VII)[2]

MAB first moves for summary judgment on Pydlek's EPA and IEPA claims. The EPA and IEPA both prohibit wage discrimination on the basis of sex. 29 U.S.C. § 206(d)(1); 820 Ill. Comp. Stat. 112/10(a). As the plaintiff, Pydlek bears the initial burden of raising a prima facie case by showing "a difference in pay for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012) (quoting 29 U.S.C. § 206(d)(1)). "If this requirement is satisfied, the burden of proof shifts to [MAB] to prove some neutral factor that explains the discrepancy in salary." *Lauderdale v. Ill. Dep't of Hum. Servs.*, 876 F.3d 904, 907 (7th Cir. 2017).

### A. Prima Facie Case

The Court first analyzes whether Pydlek has met her initial burden of establishing a prima facie case. To do so, Pydlek must establish: "(1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions." *Fallon v. State of Illinois*, 882 F.2d 1206, 1208–09 (7th Cir. 1989). The parties do not dispute the first element: MAB admittedly paid both Nied and Crafton higher salaries than Pydlek. Instead, the parties focus their arguments on the second and third elements. While Pydlek argues that Nied and Crafton performed equal work under similar working conditions, MAB disagrees.

Starting with Crafton, the Court finds that Pydlek has not met her burden of establishing that he did equal work requiring equal skill, effort, and responsibility. Although MAB hired

---

[2] These claims are "evaluated using the same standards." *Owens v. Dufresne Spencer Grp. LLC*, No. 22 C 2801, 2024 WL 3028470, at *11 (N.D. Ill. June 17, 2024); *see also* 29 U.S.C. § 206(d)(1); 820 Ill. Comp. Stat. 112/10(a).

Crafton as "Procurement Director" in July 2024, Doc. 30 ¶ 81, Pydlek presents no evidence as to what this position entailed. A jury cannot simply infer that Crafton was a proper comparator based on his job title alone; the identified comparators must be "substantially equal" based on their "actual job performance and content—*not job titles*, classifications or descriptions." *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 913 (7th Cir. 2002) (emphasis added) (citation omitted); *see also Jaburek v. Foxx*, 813 F.3d 626, 632 (7th Cir. 2016) ("Without evidence of characteristics like 'what [the male employees'] duties were, when they started work, where they worked, and what their backgrounds were,' a jury cannot determine the comparability of work between the employees of the opposite sex.").

The lack of evidence regarding Crafton does not doom Pydlek's claim, however, because the Court finds that she has sufficiently established a prima facie case using Nied as a comparator. Starting with the equal work element of her prima facie case, "[w]hether two jobs require equal skill, effort, and responsibility . . . is a factual determination." *Fallon*, 882 F.2d at 1204. Pydlek must establish a "common core of tasks," meaning that "a significant portion of the two jobs [was] identical." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 230 (7th Cir. 2017) (quoting *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 695 (7th Cir. 2006)). If there is a common core of tasks, the Court then "must ask whether any additional tasks make the jobs substantially different." *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 698 (7th Cir. 2003). "Insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." 29 C.F.R. § 1620.14(a); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 203 n.24 (1974) ("[I]t is now well settled that jobs need not be identical in every respect before the Equal Pay Act is applicable."). And, as discussed, the analysis should be based on the

8

employees' "actual job performance and content—not job titles, classifications or descriptions." *Markel*, 276 F.3d at 913 (citation omitted).

Based on the evidence presented, the Court concludes that a reasonable jury could find that Pydlek and Nied shared a common core of responsibilities. Although their job titles differed, Pydlek and Nied were both ultimately responsible for leading the procurement department. Doc. 30 ¶ 7; *see also* Doc. 31-2 at 54:1–3 (testifying that it was Pydlek's "job to lead the procurement department"); *id*. at 94:2–3 (testifying that the director role "was repurposed to lead the procurement function to a VP level"). And it is undisputed that, after MAB eliminated Pydlek's position, "the duties that were previously encompassed within [her] position were taken over by" Nied. *Id.* ¶ 60. These duties included overseeing strategy development and sourcing execution, identifying alternative supply sources, leading contract negotiations, identifying and evaluating risks and opportunities, and identifying and implementing improvement initiatives. Doc. 30 ¶¶ 7, 61. Notably, Nied confirmed during his deposition that these duties constituted the "core responsibilities" of his role. *Id.* ¶ 61 (citing Doc. 31-12 at 34:12–34:23).

MAB nonetheless argues that Nied's position required "additional responsibilities beyond Pydlek's former responsibilities as the Director of Procurement." Doc. 29 at 8. Specifically, MAB asserts that:

> Nied is required to have executive level presence, be able to craft and executive a strategic agenda, have experience within a vast range of industries with global reach, create value, drive development, think strategically, manage the increased scope of MAB's business, build and staff a high-functioning and engaged team, understand and have experience with the risk management aspects of procurement, build and maintain positive and strategic partnerships with vendors, and represent MAB in a professional way externally and internally.

*Id.* at 8–9.[3]  But this only serves to highlight the existence of a material issue of fact, because the parties have presented evidence that conflicts with these assertions.  For example, multiple witnesses testified that Pydlek's responsibilities included risk management, meaning that she also had experience with the risk management aspects of procurement.  *See* Doc. 31-2 at 58:16–16; Doc. 31-7 at 41:18–42:1; Doc. 31-8 at 87:6–9.  Additionally, Sacksteder provided Pydlek with feedback about her "stratigic [sic] thinking," "executive presence," and work "building a team" on multiple occasions, *see* Doc. 31-7 at 9, 12, 29, indicating that these responsibilities and skills were also expected of her as the director of procurement.  While it is possible that Nied's position included additional responsibilities that differentiated him from Pydlek, this is a question better left for the jury.

The Court also finds that a jury could reasonably conclude that Nied and Pydlek shared similar working conditions.  A plaintiff satisfies this element with proof that two employees experience the same "physical surroundings or hazards in performing their duties."  *Cullen*, 338 F.3d at 700 n.3 (citations omitted); *see also* 29 C.F.R. § 1620.18 ("The term 'similar working conditions' encompasses two subfactors: 'surroundings' and 'hazards.'  'Surroundings' measure the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity and their frequency.  'Hazards' take into account the physical hazards regularly encountered, their frequency and the severity of injury they can cause.").  In this case, there is no evidence that Pydlek and Nied were "exposed to different physical surroundings or hazards in performing their duties, therefore they cannot be said to work under dissimilar conditions."  *Cullen*, 338 F.3d at 700 n.3.

---

[3] MAB's brief provides no citations to the record to support these assertions, but it is apparent from the SUF that MAB is relying on Nolan's declaration as support.  *See* Doc. 30 ¶ 84 (citing Nolan Dec. ¶ 17).

For these reasons, the Court concludes that Pydlek has met her burden of establishing a prima facie case of wage discrimination under the EPA and IEPA.

## B.      Affirmative Defenses

Because Pydlek has sufficiently demonstrated a prima facie case of wage discrimination, the burden shifts to MAB to "prove some neutral factor that explains the discrepancy in salary." *Lauderdale*, 876 F.3d at 907.  The EPA "provides four affirmative defenses by which the employer can claim the discrepancy is not discriminatory: 'where . . . payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Id.* (citing 29 U.S.C. § 206(d)(1)).  This justification need not be a "good reason," but merely a nondiscriminatory one. *Wernsing v. Dep't of Hum. Servs.*, 427 F.3d 466, 468 (7th Cir. 2005). The justification "must also be bona fide," meaning "the factor is used and applied in good faith." *Fallon*, 882 F.2d at 1211.  "An employer asserting that the difference is the result of a 'factor other than sex' must present this contention as an affirmative defense—and the proponent of an affirmative defense has the burdens of both production and persuasion." *Id.*

Initially, MAB argues that the lowest paid director in 2023 was a male employee and the two highest paid directors were female employees.  According to MAB, this alone "refutes any inference of unequal pay." Doc. 29 at 8.  But MAB provides no details regarding these other directors' job responsibilities, tenure, or credentials, making it impossible to properly contextualize their salaries.  This evidence is therefore of little help to MAB's affirmative defense. *See Owens*, 2024 WL 3028470, at *13 (explaining that defendant's argument that "two African American DC supervisors . . . were paid more than some or all of Owens's comparators" was unpersuasive in part because their "prior work experience is unknown"); *White v. Elkhart*

11

*Cmty. Sch.*, No. 3:19-CV-64, 2024 WL 2049464, at *9 (N.D. Ind. May 7, 2024) ("[W]hether other women enjoyed greater pay in their station speaks little on this record to whether [plaintiff] failed to receive equal pay for equal work.").

Next, MAB argues that Nied's higher salary was based on his experience and credentials, along with his "executive level presence, ability to think strategically, and passion for procurement." Doc. 29 at 9. MAB also argues that it "had to make Nied a competitive offer, and his starting salary was based on salary benchmarking and his salary expectations, each of which is a permissible 'factor other than sex.'" *Id.* at 10; *see also* Doc. 33 at 5 ("Nied's superior experience . . . satisfies MAB's burden of identifying a factor other than sex."). MAB is correct that "differences in education and experience may be considered factors other than sex." *Merillat*, 470 F.3d at 697. Moreover, the Seventh Circuit "has repeatedly held that a difference in pay based on the difference in what employees were previously paid is a legitimate 'factor other than sex.'" *Lauderdale*, 876 F.3d at 908 (collecting cases). But "[a] mechanical recitation of experience and education does not meet the [employer's] burden," *White*, 2024 WL 2049464, at *8, and it is not enough to simply articulate "potentially explanatory variables, without proving that they *actually* account for the difference," *King*, 678 F.3d at 474; *see also Lauderdale*, 876 F.3d at 908 ("An employer's given explanation for a pay discrepancy must be supported by evidence that the employer actually relied on that reason."). At the summary judgment stage, MAB "must point to a record that would compel any reasonable juror, even one drawing all reasonable inferences in [Pydlek's] favor, to find that the pay differential stems from" a factor other than sex. *Mayden v. Superior Ambulance Serv., Inc.*, 647 F. Supp. 2d 1014, 1023 (N.D. Ind. 2009).

12

MAB has not met this burden because it points to no evidence in its motion or reply that it *actually* considered these variables when setting Nied's salary. Indeed, MAB provides no citations to the record whatsoever in this portion of the motion. The SUF fares slightly better, providing citations to Karczewski's testimony that Nied's salary was determined based on a "combination of factors," including "[s]alary expectation." Doc. 30 ¶ 68 (citing Doc. 31-8 at 141:24–142:8, 143:18–144:7). Yet Karczewski immediately clarified during her deposition that she was not involved in setting the salaries "at that VP level;" this was instead "done at the levels above [her]." Doc. 31-8 at 142:9–13. And the other MAB executives who testified similarly confirmed that they were not involved in setting Nied's salary. Doc. 31-4 at 17:2–4 (Nolan testifying that he was not "involved in setting [Nied's] compensation package"); Doc. 31-6 at 111:1–7 (Sacksteder testifying that he "reviewed" and "agreed to" Nied's compensation package but "wasn't the one that really developed" it). Because these executives were not responsible for setting Nied's salary, their testimony cannot establish MAB's affirmative defense at this stage of the case. *See Owens*, 2024 WL 3028470, at *13 (testimony from executive was insufficient to establish affirmative defense under EPA because the executive "was not ultimately responsible for setting" the salaries of the comparators); *Mayden*, 647 F. Supp. 2d at 1022 (defendant could not prevail on affirmative defense at the summary judgment stage because "[n]o [] official with pay-setting authority testified that [comparator's] superior experience and education are why his pay is greater than [plaintiff's]").

For similar reasons, Nolan's declaration stating that "gender had no impact on any decisions that MAB made concerning" Pyelek's and Nied's employment also does nothing to establish MAB's affirmative defense. Doc. 31-1 ¶¶ 20–22. Under Federal Rule of Civil Procedure 56(c)(4), affidavits and declarations used to support a summary judgment motion

"must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Cambronero v. Meli*, No. 22-2103, 2023 WL 4946724, at *2 (7th Cir. Aug. 3, 2023) ("[D]eclarations must be based on personal knowledge, not unsupported conclusory assertions."). And the Seventh Circuit has instructed district courts that they "*must not* consider parts of an affidavit that fail to meet" these standards when considering summary judgment motions. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004) (emphasis added). Here, this portion of Nolan's declaration does not meet this standard. Nolan previously testified that he was not "involved in setting [Nied's] compensation package." Doc. 31-4 at 17:2–4. He similarly testified that he had "zero" involvement with determining Pydlek's "renumeration and bonus." Doc. 31-2 at 63:6–12. And his declaration does not explain how he has since come to possess any personal knowledge regarding what factors MAB considered when setting Nied and Pydlek's salaries. The Court therefore disregards this portion of his declaration. *See Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 662 (7th Cir. 2016) (holding that affidavit was not admissible on summary judgment because it "does not explain *how* [plaintiff] possibly could possess personal knowledge" of the issue detailed in her affidavit, particularly because she disclaimed such personal knowledge during her deposition).

Because Pydlek has established a prima facie case of wage discrimination and MAB has failed to "prove, and not just assert," that the difference in pay was a result of a factor other than sex, *King*, 678 F.3d at 474, the Court denies summary judgment on the EPA and IEPA claims.

## II. Gender Discrimination Claims (Counts I, III)

MAB also moves for summary judgment on Pydlek's Title VII and IHRA gender discrimination claims. Title VII makes it unlawful for an employer to "fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). "Membership in a protected class need not have been the *only* factor; an employer discriminates if it 'intentionally relies in part' on the protected characteristic when it makes an adverse employment decision." *Chehade v. Foley & Lardner, LLP*, No. 24-CV-04414, 2026 WL 194526, at *5 (N.D. Ill. Jan. 26, 2026) (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 659 (2020)). "Illinois courts apply the federal Title VII framework to IHRA claims." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016).

A plaintiff can prove sex discrimination by using the traditional burden-shifting framework laid out in *McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973).[4] This burden-shifting framework "is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases," but it is "not the only way to assess circumstantial evidence of discrimination." *David*, 846 F.3d at 224. A plaintiff can alternatively "prove discrimination in a holistic fashion, by proffering 'direct or circumstantial evidence of intentional [gender] discrimination.'" *Wince*, 66 F.4th at 1040 (citations omitted). The Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). Regardless of which approach a plaintiff adopts, however, the key inquiry at the

---

[4] Under this burden-shifting approach, a plaintiff must first establish a *prima facie* case by showing "(1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (citation omitted). After this, "the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Id.*

summary judgment stage is whether the evidence, when considered as a whole, would permit a reasonable factfinder to conclude that gender caused the adverse employment action. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016).

Here, although Pydlek briefly mentions the *McDonnell Douglas* framework in her response, she appears to proceed under the holistic method instead. Rather than laying out a prima facie case, Pydlek presents various categories of circumstantial evidence to support the proposition "that MAB underpaid, under-titled, fired, and failed to consider Pydlek [for] alternative roles at least in part based on her sex." Doc. 32 at 7–11. The Court agrees with Pydlek that this evidence, when "viewed as a whole and in the light most favorable to her," is sufficient to permit a reasonable jury to infer "an overall likelihood of discrimination." *Ortiz*, 834 F.3d at 763.

### A.      Reliance on Sex-Role Stereotypes

Pydlek first argues that the evidence in the record would allow a reasonable jury to conclude that MAB impermissibly relied on sex-role stereotypes when making decisions as to her compensation, promotion, termination, and placement on the no-hire list. The Seventh Circuit has held that "basing an employment decision on an employer's notions of how women do or ought to behave—the employer's sex-role stereotypes—is discrimination 'because of sex.'" *Joll*, 953 F.3d at 930. For example, "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250 (1989). The same is true where an employer acts on the belief that "women are or ought to be submissive," rather than "insubordinate or dominant." *Joll*, 953 F.3d at 931. And evidence that an employer repeatedly criticized a female employee for "interpersonal skills," while tolerating those "same types of deficiencies . . . in male

16

employees," suggests that the employer "may have relied on impermissible stereotypes of how women should behave." *Bellaver*, 200 F.3d at 490, 492.

MAB does not respond to this sex-role stereotype argument and has thus waived any opposition. *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir. 2010) ( "Failure to respond to an argument . . . results in waiver" and "silence leaves us to conclude" concession.). Regardless, a reasonable jury could infer that MAB decided to terminate Pydlek and designate her as ineligible for rehire, rather than promote her to the VP of procurement position, based on impermissible sex-role stereotypes.

Many of the criticisms MAB executives levied towards Pydlek related to her "aggressive" and "abrasive" personality, as well as her off-putting tone, lack of office etiquette, and interjections during meetings. For example, Karczewski testified that she received complaints that Pydlek had been "aggressive" and "badgering" during conversations, Doc. 31-8 at 119:19–120:3, and Nolan testified that Pydlek's "style of leadership" was "just not good" because she was "very abrasive" and had "huge gaps in terms of self-awareness, social awareness, self-regulation, and empathy," Doc. 31-2 at 118:20–119:6, 120:17–121:3. Sacksteder also repeatedly criticized Pydlek for speaking during meetings, describing her interjections as "very self-serving" and informing her that "every point [she] want[s] to make does not always have to be interjected immediately." Doc. 31-7 at 29–30. He further informed her that her "tone and nature of questions has been a source of frustration for many people" and that she "talked down" to other employees. *Id.*

While it is possible that these were innocent comments, it is also possible that a reasonable jury could conclude that Pydlek "was being penalized for transgressing the age-old stereotype that women are or ought to be submissive." *Joll*, 953 F.3d at 931–32. Indeed,

17

numerous courts have denied summary judgment when faced with similar facts. *See, e.g.*, *Hannon v. City of Prospect Heights*, No. 18 C 2475, 2023 WL 4273662, at *13 (N.D. Ill. June 29, 2023) (denying summary judgment where defendants criticized plaintiff for "improperly interjecting her opinion during discussions between council members" because a reasonable jury might conclude that this was based on "gender-based animus"); *Smarandescu v. Iowa State Univ. of Sci. & Tech.*, No. 4:17-CV-00130, 2018 WL 11536715, at *12 (S.D. Iowa Sept. 20, 2018) ("Evidence of criticism of Plaintiff as 'abrasive' throughout the tenure review process creates a material question of fact as to whether gender stereotyping was a factor in Plaintiff's evaluation."); *Arjangrad v. JPMorgan Chase Bank, N.A.*, No. 3:10-CV-01157, 2012 WL 1189750, at *24 (D. Or. Apr. 9, 2012) ("[Defendants] repeatedly criticized her aggressive, argumentative, and contentious demeanor, which a jury could reasonably view as evidence of their intolerance of her non-conformity with the submissive female stereotype."); *Klings v. N.Y. State Off. of Ct. Admin.*, No. 04-CV-3400, 2010 WL 1292256, at *15 (E.D.N.Y. Apr. 5, 2010) (holding that a jury could conclude that criticisms of female plaintiff's "rigid personality, micromanagement style, and difficulties interacting with people" were "based on a gender bias"). And this conclusion is only strengthened by the fact that MAB hired Nied despite concerns about his "relatively low score in empathy" and tendency to "become argumentative and controlling" when stressed. Doc. 30 ¶ 68. While those qualities were considered excusable in Nied, they rendered Pydlek unqualified for the VP of procurement position in the eyes of Sacksteder and Nolan.

Another prominent criticism included in the feedback given to Pydlek related to her prior requests for raises and salary increases. MAB executives described these requests as immature, inappropriate, and self-serving. For example, Nolan testified that Pydlek's "attempts to improve

salary positioning" were "self-serving," and that she should have "let [her] performance . . . speak for itself," instead of "pushing things." Doc. 31-2 at 121:22–122:23; *see also* Doc. 31-7 at 19 ("We previously discussed the language that you use regarding the bonus that it comes across as self-serving."). Notably, Nolan testified during his deposition that he did not consider it self-serving when Nied negotiated his salary. Doc. 31-4 at 17:7–15. A reasonable jury could rely on this evidence as further support for a finding that MAB made decisions regarding Pydlek's employment based on sex-role stereotypes, because the idea that "women should not be 'as pushy as men in asking for raises' is a recognized gender stereotype." *Dewalt v. All. Pharma Inc.*, No. CV 21-1064, 2022 WL 4237483, at *4 (E.D. Pa. Sept. 14, 2022) (citations omitted); *see Miller v. Levi & Korsinsky, LLP*, 695 F. Supp. 3d 397, 413 (S.D.N.Y. 2023) (denying summary judgment because a reasonable jury could conclude that defendants' "stereotypical view of women" caused plaintiff's termination based on evidence that defendants described plaintiff as "too aggressive" when negotiating her bonus and told her that "another female partner would not have negotiated her bonus because she 'knew her place'").

Moreover, when Pydlek responded to these criticisms by sharing information about unconscious bias, MAB executives immediately concluded she was simply trying to justify poor behavior and did not investigate. In his deposition, Nolan testified that he believed Pydlek's response "was another example of [her] not taking feedback." Doc. 31-2 at 127:3–12. He did not believe this was the right approach for Pydlek to take, testifying that he "would have expected" her to respond to the feedback by "go[ing] away and say[ing], you know what, [Nolan], thanks ever so much for your feedback, which I will digest over the next few days." *Id.* at 129:1–4.[5]

---

[5] This is despite the fact that Pydlek *did* thank Nolan for his feedback in her email about unconscious bias. Doc. 31-7 at 20 ("Thanks for your time today and the continued feedback to help me improve; it's much appreciated.").

Sacksteder and Karczewski provided similar testimony, despite admitting that MAB did not investigate Pydlek's concerns regarding unconscious bias. *See* Doc. 41-6 at 90:19–91:2, 92:7–11 (Sacksteder testifying that he found Pydlek's response "very strange" and "kind of dismissed it as odd"); Doc. 31-8 at 117:19–118:18 (Karczewski testifying that Pydlek's email was "a way to deflect the performance feedback" rather than "owning and accepting" it). The same was true in *Maier v. United Parcel Service, Inc.*, 721 F. Supp. 3d 693 (N.D. Ill. 2024), where the plaintiff challenged the employer's decision not to promote her as discriminatory. *Id.* at 718. In response to her complaint, the employer did not initiate an investigation and instead believed plaintiff was simply "venting," telling her "to 'calm down.'" *Id.* The court emphasized that, because "the same behavior may be labeled 'venting' in a woman but taken seriously in a man based on the 'age-old stereotype' that women are overly emotional or hysterical," a reasonable jury "could infer that sex stereotypes . . . were an important part of the [] promotion discussion." *Id.*; *see also Arjangrad*, 2012 WL 1189750, at *24 (finding that a jury could reasonably view defendants' criticisms of plaintiff arguing and interrupting, "rather than hear[ing] the constructive aspects of what [supervisor] was attempting to communicate," as evidence of "intolerance of her non-conformity with the submissive female stereotype"). The Court finds the reasoning in these cases persuasive.

Finally, MAB executives consistently testified that these same concerns were the reason that they did not believe Pydlek was qualified for the newly-created VP of procurement position and why they designated her as ineligible for rehire. Thus, a reasonable jury could conclude that MAB's decision to terminate Pydlek and place her on the no-hire list, rather than promote her, amounted to gender discrimination because it was based on sex-role stereotypes.

20

B. **Treatment of Similarly-Situated Male Employees**

Pydlek also argues that a reasonable jury could infer an overall likelihood of discrimination based on evidence that MAB provided more favorable treatment to similarly-situated male employees. *Joll*, 953 F.3d at 929; *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) ("All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination."). Her argument is primarily based on MAB's treatment of Danny Walker, another director at MAB who also exhibited "concerning interpersonal behavior." Doc. 32 at 8; *see also* Doc. 31-2 (testifying about Walker's "bullying behavior," such as "shouting and screaming at team members, humiliating team members"). MAB addressed its concerns about Walker's "unprofessional behavior and interpersonal friction" in part by providing him with an executive coach to set "clear expectations of conduct" and support "a higher level of performance." Doc. 30 ¶¶ 77–78. Moreover, despite his issues, MAB promoted Walker to the position of senior director in June 2022 and later retained his position against A.T. Kearney's recommendation. Pydlek argues that this evidence provides support for an inference of discrimination because, unlike with Walker, MAB "refused to obtain an executive coach to aid her in improving her people skills before terminating [her]." Doc. 32 at 8.

MAB does not dispute that it provided Walker with more favorable treatment and instead argues only that Walker is not a proper comparator. For purposes of a Title VII claim, a proper comparator is one "similarly situated [to plaintiff] but for the protected characteristic." *Joll*, 953 F.3d at 929. This analysis "calls for a 'flexible, common-sense' examination of all relevant factors" to determine whether a "meaningful comparison" between the two employees can be made. *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012). The "number of relevant

21

factors depends on the context of the case," although plaintiffs often must establish that the comparator (1) dealt with the same decision-maker or supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Id.* at 847 (citations omitted). Importantly, the Seventh Circuit has cautioned that this is not a "magic formula" and "should not devolve into a mechanical, 'one-to-one mapping between employees.'" *Id.* (citation omitted).

In this case, a reasonable jury could conclude that Pydlek and Walker were similarly situated. First, it is undisputed that Pydlek and Walker were both directors and, although MAB later promoted Walker to senior director, no evidence exists in the record that MAB subjected directors and senior directors to different standards of conduct. Second, MAB raised concerns about leadership and communication styles with respect to both Pydlek and Walker, and MAB has pointed to no differentiating or mitigating circumstances that would distinguish their conduct or MAB's treatment of them. Finally, a reasonable jury could conclude that the same decision-makers were involved in addressing Pydlek and Walker's performance concerns. It is undisputed that Pydlek and Walker both reported directly or indirectly to Sacksteder, and Sacksteder testified during his deposition that he had participated in both Pydlek and Walker's performance evaluations. *See* Doc. 31-6 at 45:2–46:19, 61:9–10. Moreover, although Nolan was not involved in their formal evaluation process, he testified that he personally provided feedback and/or coaching to both Pydlek and Walker regarding their performance issues. Doc. 31-2 at 63:13–65:14. And both Nolan and Sacksteder testified that they were involved in the determination that Pydlek was not qualified for a promotion due to the identified performance concerns. Doc. 31-4 at 6:1–14; Doc. 31-6 at 20:17–21:1; *see also* Doc. 31-8 at 172:21–173:7.

MAB nonetheless argues that Walker is not a proper comparator because he "was a senior director outside of procurement who had a different supervisor." Doc. 29 at 10, 12. MAB notably provides no authority to support this perfunctory argument, thus waiving it. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (holding that a party waives an argument if it is "underdeveloped, conclusory, or unsupported by law"). Moreover, the Seventh Circuit unequivocally rejected this same argument in *Coleman*. 667 F.3d at 847 ("The district court concluded that Arient and Pelletier could not serve as comparators because they 'reported to a different supervisor' and 'held a substantially different job than [plaintiff].' . . . We think that this analysis focused too much on minor differences and was too demanding for purposes of summary judgment."); *see also Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011) ("Formal job titles and rank are not dispositive; an employer cannot 'insulate itself from claims of racial discrimination' by making formalistic distinctions between employees.").

Separately, Pydlek argues that MAB treated similarly-situated men more favorably by paying "men—Crafton and Nied—substantially more for substantially similar work, which constituted pay discrimination in addition to unequal pay." Doc. 32 at 8. She provides no authority to support this argument, and instead simply refers back to her discussion regarding the EPA and IEPA claims. But claims brought under the EPA and Title VII are distinct, and "liability under the Equal Pay Act does not prove a violation of Title VII." *Lauderdale*, 876 F.3d at 910. These claims have different burden distributions, which "lead to different legal standards to be applied on summary judgment." *Lauterbach v. Ill. State Police*, No. 12-CV-03228, 2015 WL 4555548, at *8 (C.D. Ill. July 28, 2015). Because Plaintiff has not provided any supporting authority or explanation regarding unequal pay specific to her gender discrimination claims, she has waived the issue. *See Puffer*, 675 F.3d at 718.

23

### C.      Underrepresentation of Women in MAB's Workforce and Leadership

Pydlek also argues that the underrepresentation of women within MAB's workforce, and particularly among the upper-management positions, "is further proof of defendant's intent to engage in the unlawful gender discrimination which victimized" Pydlek.  Doc. 32 at 9 (citing *Emmel v. Coca-Cola Bottling Co. of Chicago*, 904 F. Supp. 723, 738 (N.D. Ill. 1995), *aff'd* 95 F.3d 627 (7th Cir. 1996)).  Specifically, at the time of Pydlek's termination, "there were just two women (including Pydlek) classified as an 'executive senior level official or manager.'"  *Id.* (citing Doc. 30 ¶ 6).  Moreover, as of 2025, "just 28% of full-time team members are female." *Id.*  MAB does not respond to this argument, thus conceding the issue.  *Bonte*, 624 F.3d at 466.

### D.      Dishonest Justifications for Termination

Finally, Pydlek argues that a reasonable jury could infer discrimination based on evidence that MAB's explanations for terminating her were not honest and instead were pretexts for discrimination.  "Employment discrimination law has long recognized that an employer's dishonest explanation of a decision can support an inference that its real reason was unlawful." *Joll*, 953 F.3d at 932.  "If the jury does 'not believe the employer's explanation for its decisions, it may infer that the employer is trying to cover up . . . discrimination[.]'"  *Id.* (quoting *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994)).  Pydlek makes multiple arguments regarding this issue, none of which are persuasive.[6]

First, Pydlek argues that a reasonable jury could infer pretext based on MAB's "shifting explanations" for her termination.  *See Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340

---

[6] The Court notes that, because Pydlek is not relying on the *McDonnell Douglas* framework, "she may survive summary judgment even without evidence that the employer's explanation is dishonest."  *Joll*, 953 F.3d at 933 ("A plaintiff is *required* to show pretext when her only other evidence of discrimination is the prima facie *McDonnell Douglas* showing.").  Thus, the failure to create a triable issue of material fact on this issue does not doom Pydlek's claim.

24

F.3d 573, 579 (7th Cir. 2003) ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."). Specifically, although MAB's employment records cited "restructuring" as the reason for Pydlek's termination, MAB argues in its motion that MAB terminated Pydlek for "fail[ing] to meet MAB's legitimate expectations." Doc. 32 at 9. The Court disagrees. MAB has consistently asserted that it terminated Pydlek because (1) it eliminated her role in the restructuring and (2) she was not qualified for the newly-created VP role due to issues with her leadership and performance. MAB asserts that both reasons played a role in Pydlek's termination, and it is not inconsistent for MAB to discuss both reasons in briefings.

With respect to MAB's restructuring explanation, Pydlek argues that the restructuring itself was pretextual because Pydlek was the only employee terminated because of A.T. Kearney's analysis. But she provides no authority to support this argument, nor does she provide any evidence that MAB's choice to terminate only one employee was pretextual. This argument is therefore unpersuasive.[7] *See Graves v. Job Works, Inc.*, No. 3:07-CV-591, 2009 WL 4545108, at *10 (N.D. Ind. Nov. 30, 2009) ("Graves has not shown that it was pretext to only terminate her in the RIF . . . Graves has pointed to nothing suggesting that [executives] did not genuinely believe they needed to terminate one [employee] because of the funding cut, and that they dismissed her because they believed she was the weakest [employee].").

Pydlek also challenges MAB's purported concerns with her performance and leadership, arguing that a reasonable jury could infer that these concerns were pretextual because MAB (1) did not document these concerns at or near the time they occurred and (2) did not provide Pydlek with written warnings or a personal improvement plan. But the Seventh Circuit has

---

[7] The Court notes that Pydlek again mentions MAB's choice not to terminate Walker, despite his behavioral issues. Because the Court discussed this issue in a previous section, the Court does not address it again here.

explained that a defendant's failure to document or communicate performance problems does not constitute evidence of pretext. *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994); *see also Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 827 (7th Cir. 2006) ("[T]he failure to communicate performance problems does not constitute evidence of pretext."). Pydlek does nothing to distinguish this binding authority, and the single case she cites is inapposite.[8]

Pydlek's remaining arguments challenge the wisdom or correctness of MAB's reasons for terminating her. For example, she argues that it was "understandable" that suppliers were frustrated with her because it was "a difficult year for the company." Doc. 32 at 10. She excuses a missed performance review deadline by explaining that she completed an informal review instead and arguing that other managers had also missed the deadline. And she claims to have been working on addressing MAB's concerns at the time of her termination, arguing that this undermines MAB's reasons for not considering her for other positions. None of this evidence is relevant, because the wisdom of MAB's decisions is not a matter for the Court. *See Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996) ("Employers may act for many reasons, good and bad; they may err in evaluating employees' strengths," but "unless they act for a forbidden reason, these errors (more properly, differences in assessment) do not matter." (citations omitted)); *Howard v. Donahoe*, No. 11 C 2442, 2012 WL 5845581, at *4 (N.D. Ill. Nov. 19, 2012) ("Those reasons for firing [plaintiff] may not be good ones, but they have nothing to do

---

[8] Specifically, Pydlek cites to *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908 (7th Cir. 2010), claiming that the Seventh Circuit "revers[ed] summary judgment where the alleged non-discriminatory reason for firing 'was hardly investigated at the time.'" Doc. 32 at 10. This quoted language is not in the case but instead appears to have come from the LexisNexis case summary. In the opinion itself, the Seventh Circuit held that a reasonable jury could conclude that the defendant's reasons for terminating the plaintiff were pretextual in part because a director "conducted his own investigation and decided to fire" the plaintiff "*within 24 hours* of receiving [the] complaint." 612 F.3d at 916 (emphasis added). The issue was not that defendant did not investigate or document the complaint at or near the time they received it; the issue was that the director investigated the complaint unusually quickly and in a perfunctory manner. That is not the case here.

26

with sex discrimination[.]"). Thus, a reasonable jury could not rely on this evidence to support a finding of pretext.

Even without evidence of pretext, the Court concludes that Pylek has presented sufficient evidence otherwise to "permit a reasonable jury to infer 'an overall likelihood of discrimination' that merits a trial, not summary judgment." *Joll*, 953 F.3d at 929. While it is possible that a jury could determine that MAB's actions regarding Pydlek's employment were "entirely innocent, involving no unlawful discrimination," there is "at least *one* reasonable way to tell the story in favor of [Pydlek's] claim of sex discrimination." *Id.* at 935. The Court therefore denies summary judgment on Counts I and III.

## III.     Retaliation Claims (Counts II, IV, VI, VIII)

Finally, MAB moves for summary judgment on Pydlek's retaliation claims. As a preliminary matter, the Court notes that, although MAB has moved for summary judgment on all Pydlek's claims, both parties seemingly fail to address the IEPA and FLSA retaliation claims. The IEPA prohibits retaliation against employees for complaints of gender-based wage discrimination, 820 Ill. Comp. Stat. 112/10, whereas the FLSA prohibits retaliation against employees for asserting their FLSA rights. *Hernandez v. City Wide Insulation of Madison, Inc.*, 508 F. Supp. 2d 682, 688 (E.D. Wis. 2007). Upon review of the parties' briefings, it appears that their arguments apply only to Pydlek's Title VII and IHRA retaliation claims. This omission is explicit in Pydlek's response, as she expressly limits her retaliation arguments to "Counts II and IV." Doc. 32 at 11; *see also id.* (discussing standard for retaliation claims brought "*under Title VII or the IHRA*" (emphasis added)). And while MAB does not explicitly limit its retaliation arguments to these two claims, the arguments it makes do not substantively address the IEPA or FLSA retaliation claims. MAB does not argue that no issues of material fact exist as to whether

27

it retaliated against Pydlek for complaining of gender-based pay discrepancies or FLSA violations, nor does it cite to any cases discussing these claims. Instead, MAB cites only to cases discussing Title VII retaliation claims, focusing its arguments on Pydlek's theory that MAB retaliated against her "because she shared research findings regarding unconscious bias and how it can impact female employees." Doc. 28 at 1. And the parties do not argue that a reasonable jury could interpret the unconscious bias email as a complaint about unequal pay or the FLSA. The Court will not make the parties' arguments for them and denies summary judgment on these claims. *Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments."). Because the Court presumes that these claims are still in the case, the parties should be prepared to discuss the status of these claims at the next status hearing.

Turning to the Title VII and IHRA retaliation claims, Pydlek can survive summary judgment by presenting evidence of: "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Dirickson v. Intuitive Surgical, Inc.*, 657 F. Supp. 3d 1103 (N.D. Ill. 2023).[9] MAB does not dispute that Pydlek suffered adverse employment actions when MAB terminated her, failed to consider her for the new director roles, and designated her as ineligible for rehire, but instead argues that Pydlek has not presented evidence to create genuine issues of material fact with respect to the first and third elements. The Court will address each element in turn.

---

[9] Alternatively, Pydlek can establish retaliation under the indirect method by showing that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Smuk v. Specialty Foods Grp., Inc.*, No. 13-CV-8282, 2016 WL 3742849, at *11 (N.D. Ill. July 13, 2016). The burden would then shift to MAB "to come forward with a legitimate, non-invidious reason for its adverse action," at which point Pydlek would bear the burden of showing that this reason is pretextual. *Id.* Pydlek does not utilize this method, and the Court therefore analyzes her claim only using the direct method.

A.      **Statutorily Protected Activity**

Pydlek argues that she engaged in statutorily protected conduct "when she complained to Sacksteder and Nolan that criticism about her interpersonal skills were at least partially based on unconscious bias against her as woman." Doc. 32 at 11. While MAB argues that "no reasonable jury could find that the email was statutorily-protected activity" because "[n]owhere in her lengthy email did Pydlek ever allege gender discrimination," Doc. 29 at 14, it provides no explanation or support for this argument and therefore waives it. *See Puffer*, 675 F.3d at 718.

Even if MAB had not waived this argument, the Court agrees with Pydlek that she has presented sufficient evidence to create a triable issue of material fact. The Seventh Circuit has made clear that "an informal complaint may constitute protected activity for purposes of retaliation claims." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). Moreover, "it is not necessary that the plaintiff 'utter . . . magic words' in opposing an employer's discriminatory conduct if the context of the plaintiff's complaints allow a reasonable inference that it is." *Nichols v. Ill. Dep't of Transp.*, 152 F. Supp. 3d 1106, 1139 (N.D. Ill. 2016). And here, Pydlek has presented sufficient evidence for a reasonable jury to infer from the circumstances that she was complaining about sex discrimination.

Pydlek sent her email about unconscious bias shortly after Nolan and Sacksteder provided her with feedback about her performance. She stated that she was "exploring some of [her] personal issues" in the email, sharing her "findings on why confident, professional women can sometimes be negatively perceived as abrasive when being assertive at work." Doc. 31-7 at 20. And many of the findings in Pydlek's emails are clearly analogous to the feedback she received. *Compare id.* at 22–24 (Pydlek sharing that women are more likely to receive "negative personality criticism," such as being "told to 'watch their tone'" and more likely to be perceived

as "aggressive, selfish and not someone who would be a good team player"), *with id.* at 30 (Sacksteder criticizing Pydlek for her "tone," lack of "collaborat[ion]," and "ill-timed interjections [which] come across very self-serving"), and *id.* at 19 (Nolan criticizing Pydlek for being "self-serving" and telling her to "be more empathetic").  This was clear to Nolan, who testified that he understood the email to be Pydlek's attempt to "offer perspective" regarding his and Sacksteder's comments that she was "a bit abrasive and all the rest of it."  Doc. 31-2 at 130:3–9.  It would not be unreasonable for a jury to conclude, based on this context, that Pydlek's unconscious bias email was a complaint about sex discrimination.

### B.  Causation

To establish causation, Pydlek must "offer evidence that a retaliatory motive was a 'but-for cause of the challenged employment action.'"  *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022) (citation omitted).  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.*  "If plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate."  *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013).  Here, the Court finds that Plaintiff has presented sufficient circumstantial evidence that MAB terminated her and failed to hire her for other roles because of her protected conduct.

Pydlek first points to the suspicious timing of MAB's decision to terminate her employment, arguing that this timing allows an inference of causation.  "Although a short period of time between the filing of a charge of discrimination and an allegedly retaliatory action is rarely enough by itself to create a triable issue, the timing of events 'is often an important

30

evidentiary ally of the plaintiff.'" *Lang v. Ill. Dep't of Child. & Fam. Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) (citation omitted). "Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment, provided that there is also other evidence that supports the inference of a causal link." *Id.* (citation omitted).

When viewing the evidence in the light most favorable to Pydlek, the Court agrees that a reasonable jury could find the timing suspicious. It is undisputed that A.T. Kearney concluded its analysis on September 16, 2022, at which point it provided a report recommending that MAB eliminate Pydlek's position. Doc. 16 ¶¶ 50–54; *see also* Doc. 31-3 at 31 (A.T. Kearney's report dated September 2022). Yet MAB only made the decisions to eliminate Pydlek's role and not consider her for the newly-created VP position in "the very beginning of December . . . or at the end of November," Doc. 30 ¶ 58, mere days after she sent the email regarding unconscious bias. *See Bartlett v. NIBCO Inc.*, No. 3:08-CV-597, 2010 WL 1779887, at \*4 (N.D. Ind. Apr. 28, 2010) ("Bartlett's strongest circumstantial evidence is the suspicious timing of her termination, which occurred just 11 days after [the protected conduct]."). Moreover, Nolan and Sacksteder did not begin documenting their purported concerns with Pydlek's behavior until after receiving her unconscious bias email. Indeed, the first time Nolan and Sacksteder documented these concerns was on December 2, 2022, again mere days after receiving her unconscious bias email. *See Lang*, 361 F.3d at 419–20 (finding that "the timing of [plaintiff's] discipline is extremely suspicious" where supervisor first "began issuing frequent written reprimands of his work" immediately after the protected conduct).

MAB does not dispute that this timing is suspicious but instead argues that "suspicious timing alone rarely is sufficient to create a triable issue." Doc. 29 at 14 (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006)). While this is a correct statement of the

31

law, Pydlek does not solely rely on suspicious timing. Pydlek also argues that a reasonable jury could infer retaliatory intent from MAB's dismissive and disparaging response to her protected conduct. As discussed, Nolan, Sacksteder, and Karczewski wholly dismissed Pydlek's email about unconscious bias as a "strange" and "odd" attempt to justify her poor behaviors. As a result, they refused to investigate her claims of unconscious bias. The Court agrees that this evidence further supports an inference of causation. *See Maier*, 721 F. Supp. 3d at 723–25 (agreeing that "dismissive refusal to investigate Maier's discrimination complaints" and characterization of those complaints as "venting" permit an inference of retaliatory intent); *Jackson v. Raemisch*, 726 F. Supp. 2d 991, 1007 (W.D. Wis. 2010) ("Disparaging comments made about a plaintiff's protected conduct followed shortly by adverse treatment is sufficient evidence to defeat defendants' motion for summary judgment."). MAB does not respond to this argument, thus conceding the issue. *Bonte*, 624 F.3d at 466.

Additionally, Pydlek argues that MAB's refusal to consider her for another position is more circumstantial evidence supporting causation. The Court agrees. Despite her four-year tenure and positive annual performance evaluations, MAB not only refused to even consider Pydlek for another position that was open at the time but also designated her as ineligible for rehire for any future positions that became available. This, along with the other circumstantial evidence, could allow a reasonable jury to conclude that her protected activity caused the adverse employment actions. *See Bartlett*, 2010 WL 1779887, at *4 ("Geers' refusal to consider her for another apparently open position . . . could lead a reasonable fact finder to conclude that her termination was retaliatory."). Again, MAB concedes this issue by not responding to Pydlek's argument. *Bonte*, 624 F.3d at 466

32

Because Pydlek has presented sufficient evidence from which a jury could conclude that MAB terminated her employment and failed to hire her for other roles because of her protected conduct, the Court denies summary judgment on Counts II and IV.

## CONCLUSION

For the foregoing reasons, the Court denies MAB's motion for summary judgment [28].

Dated: March 25, 2026

_____
SARA L. ELLIS
United States District Judge

33